IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHELTON KINGCADE,

                     Petitioner,

    v.                                                  OPINION and ORDER

WAYNE OLSON,[1]
                                                   22-cv-302-jdp

                     Respondent.

---

      Petitioner Shelton Kingcade, through counsel, seeks relief under 28 U.S.C. § 2254 following his convictions for one count of repeated sexual assault of a child and one count of second-degree sexual assault of a child in Dane County Case No. 2015CF1094. Kingcade raises five claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), which respondent contends are meritless. The court will deny the petition because Kingcade's claims fail on the merits.

BACKGROUND

      This background is mostly drawn from the decision of the state court of appeals affirming Kingcade's convictions and the circuit court's denial of his motion for postconviction relief. *See State v. Kingcade*, 2020 WI App 1 (table), 389 Wis. 2d 624. The state court of appeals' determination of the facts is supported by the trial transcript, which the court has reviewed in its entirety. *See generally* Dkt. 5-17; Dkt. 5-18; Dkt. 5-19.

---

[1] I have substituted Wayne Olson as respondent because he is the warden at Oakhill Correctional Institution, where Kingcade is currently incarcerated. *See* Fed. R. Civ. P. 25(d).

In 2015, the state filed a complaint alleging that Kingcade had repeatedly sexually assaulted F.F. between November 1997 and November 2000 and that he had committed a single sexual assault against S.W. between December 1, 1991, and January 31, 1992. *Kingcade*, 2020 WI App 1, ¶ 4.

A jury trial was held in late March 2016. Kingcade was represented by Michael J. Short. The state presented 18 witnesses and Short presented two.

F.F. testified as follows. "When F.F. was in middle and high school, she and Kingcade had penis-to-vagina intercourse numerous times." *Id.* ¶ 5. The sexual assaults began in 1997, when F.F. was a 13-year-old middle school student with a turbulent home life. *Id.* "Both of her parents drank heavily, her father physically abused her mother, and one of her two older siblings spent time in jail." *Id.* F.F. initially trusted and respected Kingcade as an authority figure; he coached her basketball team, the Madison Spartans, as part of the Neighborhood Intervention Program (NIP). *Id.* Through Kingcade's coaching, F.F. and Kingcade ended up spending a great deal of time together, particularly when Kingcade would drive F.F. to various places as part of his coaching responsibilities.

Kingcade initially was also F.F.'s confidant; she could talk to him about her difficult home life. *Id.* ¶ 6. "When F.F. was in seventh or eighth grade, Kingcade began asking her sexually-charged questions." *Id.* "He eventually began buying her expensive items (basketball shoes, a cell phone, lingerie, and jewelry), and taking her to sit-down restaurants." *Id.*

"While F.F. was still in middle school, Kingcade began to have sexual contact with her." *Id.* ¶ 7. The first incident was when Kingcade touched F.F.'s breasts while she and Kingcade were in a hotel room. *Id.* "This behavior escalated, and Kingcade and F.F. had sexual intercourse

2

many times over several years, both in his apartment and at hotels, including the hotel where he worked." *Id.*

F.F. knew certain personal details about Kingcade. *Id.* ¶ 8. "She described, in detail, the inside of Kingcade's apartment." *Id.* "F.F. identified a scar on Kingcade's abdomen that was hidden by his shirt." *Id.* "F.F.'s teammates testified that Kingcade did not take off his shirt at practices." *Id.*

Several of F.F.'s acquaintances, family members, and teammates testified about Kingcade's interactions with F.F. *Id.* ¶ 9. F.F.'s younger brother testified that he had told a detective that Kingcade and F.F. "hung out way too much." *Id.* "F.F.'s brother also testified that he had spent time with F.F. and Kingcade, going to movies, dinner, softball games, and Kingcade's apartment." *Id.* F.F.'s teammates testified that, even though they lived no more than a block from F.F. and a block apart from each other, Kingcade would always drop F.F. off last. *Id.* One teammate testified that, for months, she observed Kingcade drop F.F. off in his personal vehicle after 10 p.m. at least two to three times a week. *Id.* "F.F.'s teammates also testified that, despite the closeness of the team—and in their view, Kingcade's favoritism of F.F.—F.F. eventually became increasingly distant at basketball practices and games." *Id.*

"Witnesses further testified that they were suspicious about the nature of the relationship between F.F. and Kingcade, and that F.F.'s behavior and demeanor changed during this time period." *Id.* ¶ 10. "One of these witnesses was Annetta Wright." *Id.* "Wright was the team director at the Madison Boys and Girls Club where Kingcade's basketball team played, and F.F. babysat for Wright's children." *Id.* "Wright testified that she asked F.F. about her suspicions at the time, but F.F. denied any improper behavior." *Id.* "Another witness, F.F.'s

older sister, testified that she observed F.F. and Kingcade sitting in his car talking for longer than was necessary to drop F.F. off and that F.F. sometimes did not come home at night." *Id.*

The state called S.W. as a witness and questioned her about a 2015 interview with Detective Julie Johnson. S.W. told Johnson during that interview that she was a 13-year-old seventh grader when she met Kingcade in December 1991. Dkt. 5-17 at 181–82. The prosecutor asked S.W. whether she told Johnson that Kingcade had sexually assaulted her, but S.W. either denied or stated that she did not remember giving Johnson that information. *Kingcade*, 2020 WI App 1, ¶ 12. During cross-examination, S.W. testified that she didn't want to testify and that she felt "coerced and manipulated into being in court." *Id.*

The state called Johnson to testify about her 2015 interview with S.W. *Id.* ¶ 12. Johnson testified that S.W. said that she and Kingcade had penis-to-vagina intercourse at his residence in 1991 when S.W. was approximately 13 years old. *Id.* According to Johnson, S.W. did not remember some details and wanted to put the incident behind her. *Id.* The trial court allowed Johnson's testimony about S.W.'s prior inconsistent statements accusing Kingcade of sexually assaulting her as substantive evidence, determining that her testimony showed selective loss of memory. Dkt. 5-18 at 147.

The state called Dr. Anna Salter as an expert witness. *Kingcade*, 2020 WI App 1, ¶ 14. Salter has a Ph.D. in clinical psychology and public practice with a specialty in evaluating and treating both child sexual abuse offenders and victims. *Id.* Salter testified about common patterns in child sexual abuse. *Id.* "In particular, Salter discussed the difficulty that victims of childhood sexual abuse have in coming forward at the time of their abuse, memory issues related to abuse, and common reasons that victims sometimes recant their abuse disclosure." *Id.* Salter also defined what "grooming" means in the context of child sexual abuse. *Id.*

4

The jury convicted Kingcade on both counts. *Id.* ¶ 15. Represented by attorney Cole Daniel Ruby (who is also counsel in this petition), Kingcade filed a motion for postconviction relief. Dkt. 10-2. Kingcade contended that Short provided ineffective assistance of counsel by failing to:

1.  investigate and present testimony from key witnesses, who would have contradicted F.F.'s claims;

2.  sufficiently investigate evidence surrounding F.F.'s initial accusation during an unrelated 2003 homicide investigation that Kingcade sexually assaulted her, which would have which showed that F.F. had a motive to lie;

3.  present evidence that S.W. repeatedly denied any sexual assault when initially interviewed by police in 1992, and to object to the prosecutor's false arguments claiming S.W. affirmatively disclosed an assault in 1992 and then recanted; and

4.  object to and challenge irrelevant and improper statistical testimony by Salter about a study related to allegations of sexual abuse.

After three evidentiary hearings, the state circuit court denied the postconviction motion in a written order. Dkt. 10-4. Represented by Mark Maciolek, Kingcade appealed, raising claims 1–3. Dkt. 5-4. The state court of appeals affirmed the judgment and orders of the circuit court, concluding that Kingcade could not show prejudice on his ineffective-assistance claims. *See Kingcade*, 2020 WI App 1, ¶¶ 3, 22, 54, 58, 60, 77. The court also rejected Kingcade's claim based on cumulative error, concluding that he didn't show "a substantial likelihood of a different outcome, particularly given the significant evidence against him at trial." *Id.* ¶ 62. The state supreme court summarily denied review. Dkt. 5-3.

5

Represented by Ruby, Kingcade filed a habeas corpus petition in the state court of appeals, contending that Maciolek provided ineffective assistance by omitting claim 4 on direct appeal. Dkt. 5-9. The court rejected this claim, concluding that Kingcade failed to show that Maciolek's alleged errors prejudiced his trial or appeal. *See* Dkt. 5-7 at 2–4. The state supreme court summarily denied review. Dkt. 5-8.

Represented by Ruby, Kingcade brings claims 1–3, claim 4 and the related claim based on ineffective assistance of appellate counsel, and his claim based on cumulative error, which I will designate as claim 5. Dkt. 1; *see also* Dkt. 16.

ANALYSIS

**A. Legal standards**

Federal courts may grant habeas relief only if the state court's denial of relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1)–(2). A state court's adjudication is "contrary to" clearly established Supreme Court precedent if the court either: (1) reaches a conclusion on a question of law opposite to that reached by the Supreme Court; or (2) decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, courts may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the case. *Id.* at 413. For the application to be unreasonable, a state prisoner "must show that the state court's decision is so obviously wrong that its error lies

beyond any possibility for fairminded disagreement." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam). Similarly, for a state court's factual finding to be unreasonable, there must be no possibility of reasonable agreement with the finding. *See Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015); *Wood v. Allen*, 558 U.S. 290, 301–02 (2010).

When applying § 2254(d), courts look to "the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *See Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc); *see also Wilson v. Sellers,* 584 U.S. 122, 125 (2018). Review under § 2254(d) is limited to the state-court record. *See Shoop v. Twyford*, 596 U.S. 811, 819 (2022); *Dunn v. Neal*, 44 F.4th 696, 702 (7th Cir. 2022). The petitioner bears the burden to show an error under § 2254(d), and the burden of proof under § 2254 generally. *See Westray v. Brookhart*, 36 F.4th 737, 746 (7th Cir. 2022); *Quintana v. Chandler*, 723 F.3d 849, 854 (7th Cir. 2013).

Claims of ineffective assistance of counsel are governed by the two-part test in *Strickland*. To establish that counsel provided ineffective assistance, Kingcade must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. at 687. To prove deficient performance, Kingcade must show that counsel's performance "fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688. To prove prejudice, Kingcade must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**B. The state court's application of the standards**

**1. Claim 1**

Kingcade contends that his trial counsel was ineffective for failing to investigate and call three witnesses at trial to refute F.F.'s testimony: (1) his daughter, Monica Davidson; (2) his former girlfriend and roommate, Sabrina Sido; and (3) Malik Clements, a basketball player whom Kingcade coached and who was the son of a woman whom Kingcade dated in the early-to-mid 2000s.

**a. Davidson**

Kingcade says that Davidson would have contradicted several aspects of F.F.'s testimony, including testimony about whether: (1) Kingcade had Davidson call F.F. for him before he got her a cell phone; (2) other basketball players were present when Monica and Kingcade had meals with F.F.; (3) Kingcade had Monica give F.F. flowers at her middle school graduation; (4) Kingcade took Monica and F.F. to an out-of-town boys' basketball tournament; (5) Monica saw F.F. spend the night at a hotel where Kingcade used to work; and (6) Monica saw F.F. at Kingcade's apartment. Dkt. 16 at 28.

The state court of appeals rejected this claim. *Kingcade*, 2020 WI App 1, ¶ 25. It concluded: "[A]ny contradictions between Davidson's and F.F.'s testimony were not material or relevant insofar as they did not undermine the core of F.F.'s testimony—that Kingcade repeatedly sexually assaulted her over a period of years." *Id.* The court also concluded that "the value of Davidson's testimony would likely have been limited, given that Davidson is Kingcade's daughter and had a motive to testify favorably in his defense." *Id.*

This conclusion was reasonable. F.F. testified that the abuse repeatedly occurred for several years, which Monica's testimony didn't directly contradict. Also, Davidson did not

contradict numerous key aspects of F.F.'s testimony, including that Kingcade: (1) often dropped her off last; (2) parked away from her house when he picked her up; (3) gave her a questionnaire about sex before he first assaulted her; (4) bought her jewelry and a nightgown; (5) would call her house and hang up before he got her a cellphone so that she would know it was him; (6) provided her with a cellphone after the abuse ended; and (7) had a scar two inches below his belly button. Dkt. 5-17 at 77, 80, 89, 94, 99, 100, 101, 115. That testimony, along with other evidence of Kingcade's grooming and preferential treatment of F.F., supported her testimony that Kingcade repeatedly assaulted her at hotels and his apartment. And, as the state court of appeals noted, the jury would have been allowed to consider Davidson's close relationship with Kingcade in evaluating Davidson's credibility. *See Brady v. Pfister*, 711 F.3d 818, 824 (7th Cir. 2013) ("[T]he trier of fact would have been entitled to take the [family] relationships . . . into account in assessing the witnesses' credibility . . . ."); *see also United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant . . . ."). The family relationship would not have been dispositive of Davidson's credibility, Dkt. 16 at 29, but it would have been a fact for the jury to consider. The trial court instructed the jury that when determining a witness's credibility, it should consider her "interest . . . in the result of this trial," "bias or prejudice," and "possible motives for falsifying testimony." Dkt. 5-19 at 105–06. The state circuit court's finding that Davidson's post-conviction hearing testimony was inconsistent, "vague, equivocal and confused as to time and place of events" also supports the reasonableness of the state court of appeals' conclusion that the omission of that testimony was not prejudicial. *See Kingcade*, 2020 WI App 1, ¶ 25.

### b. Sido

Kingcade says that before his trial Sido made a statement to the police that would have contradicted F.F's testimony. Sido told the police that she lived with Kingcade from the late-1995-to-early-1996 period to 1999 or 2000. Dkt. 10-3 at 3. "Sido reported that she could not recall any time in which she was gone overnight from the apartment, and that Kingcade rarely spent the night away." *Kingcade*, 2020 WI App 1, ¶ 31. "Sido told police that she did not know who F.F. was and had no recollection of Kingcade bringing a female other than his daughter to the apartment." *Id.*

The state court of appeals concluded that this testimony did not contradict F.F.'s testimony. "While F.F. testified that Kingcade assaulted her at his apartment, F.F. also specifically stated that this happened after Sido moved out." *Id.* ¶ 33. F.F. also testified that Kingcade was "hiding everything," so he never took her to the apartment while Sido was there. *Id.* The court also concluded Kingcade "failed to show any inconsistency between Sido's [statement] that Kingcade may have been occasionally absent from the apartment at night and F.F.'s testimony that she spent evenings at a hotel with Kingcade." *Id.* Sido's statement did not materially contradict F.F.'s testimony, so the court of appeals' conclusion that its omission did not prejudice Kingcade was at least reasonable.

### c. Clements

Kingcade says that testimony from Clements would have supported his defense by contradicting the state's theory that Kingcade treated F.F. specially by getting her a cellphone and paying for it after the abuse ended. Dkt. 16 at 47. Clements testified at the postconviction hearing as follows. Kingcade dated his mother around 2000–2002 and later coached him in basketball. Dkt. 5-22 at 4–5. Kingcade provided rides, shoes, clothing, and meals at sit-down

restaurants for him and other players. *Id.* at 6–7. Kingcade also got him a cellphone and continued paying for it for two to three years after Kingcade stopped dating Clements's mother. *Id.* at 8–9.

The state court of appeals concluded that Clements's absence at trial was not prejudicial. *Kingcade,* 2020 WI App 1, ¶ 43. The court explained that Kingcade's treatment of Clements was of little significance because Clements was: (1) male, and thus, likely not the object of Kingcade's urges; and (2) a member of Kingcade's household who regarded Kingcade as his surrogate father. *Id.* ¶ 41.

The record supports the court's conclusion. Clements testified that Kingcade was "like a dad to [him]." Dkt. 5-22 at 4. Their close relationship would have given the jury a basis to disregard Clements's testimony, especially because he wasn't an adolescent girl. Kingcade has not pointed to any evidence in the state-court record that he provided another girl who played basketball for him a cellphone, let alone that he continued to pay for it after he stopped interacting with that girl. The state court of appeals' conclusion that Clements's absence did not prejudice Kingcade was at least reasonable.

Claim 1 lacks merit.

## 2. Claim 2

Kingcade contends that Short conducted an inadequate investigation of F.F.'s initial accusation that he sexually assaulted her, which she made in a 2003 homicide investigation. "F.F. testified that the first time she told an adult about Kingcade's sexual abuse of her was in 2003, during an interview with Detective Rob Hale." *Kingcade,* 2020 WI App 1, ¶ 45. Hale was investigating the murder of Nathaniel Divine. *Id.* "F.F.'s then-boyfriend, Takeith Tate, was eventually convicted of felony murder in the Divine case." *Id.* Hale testified that he interviewed

F.F. in 2003 because the cellphone that Kingcade had given her "showed repeated calls to Divine up until Divine's murder." *Id.* ¶ 46. Hale asked F.F. who Kingcade was because the cell phone was registered in his name, and F.F. said that Kingcade was "a guy that was molesting her." *Id.* Hale testified that he did not report F.F.'s allegation at that time because F.F. was 19 years old by then and did not want to pursue charges. *Id.*

Kingcade says that there was evidence that F.F. participated in the homicide. F.F.'s cellphone was used to place calls to Divine leading up to the robbery and shooting, F.F. drove Tate to the scene and away from it, and F.F. split the proceeds of the robbery with Tate. *See* Dkt. 5-17 at 129–30; Dkt. 5-18 at 161–62. So, the argument goes, F.F. told Hale that Kingcade sexually assaulted her to: (1) curry favor with the investigator and avoid being prosecuted for her role in the homicide; and (2) retaliate against Kingcade for providing information that led to the arrest and conviction of Tate. *See* Dkt. 16 at 30. Kingcade explains that an adequate investigation by Short would have revealed evidence: (1) showing that F.F. lied to investigators; and (2) contradicting several aspects of testimony by F.F. that minimized her role in the homicide and connection to Tate and the shooter, Ben Napier. *See id.* at 31.

The state court of appeals rejected claim 2 for two reasons. First, "Kingcade's ability to present such evidence was limited because . . . F.F.'s involvement in the Divine homicide trial was a collateral matter, and . . . Kingcade could not have introduced extrinsic evidence to impeach F.F. on collateral issues." *Kingcade*, 2020 WI App 1, ¶ 50 (citations omitted). Second, the missing evidence "was cumulative to the evidence that Kingcade's trial counsel did elicit on this subject." *Id.* ¶ 51. As the court explained, Short attacked F.F.'s credibility on cross-examination "by linking her to the . . . homicide." *Id.* "Later in the trial, Kingcade emphasized this again by questioning [Hale] about F.F.'s involvement in the homicide." *Id.*

"During arguments, Kingcade pressed his theory that F.F. had a motive to falsely accuse Kingcade to deflect attention away from herself and to punish Kingcade for pointing the finger at her boyfriend." *Id.*

This decision was reasonable. The state court of appeals determined that Kingcade had only a limited ability to present admissible evidence concerning F.F.'s initial accusation to the police, and state-law evidentiary errors are not themselves a basis for habeas relief. *Friar v. Wiersma*, No. 21-cv-725-jdp, 2024 WL 4751380, at *6 (W.D. Wis. Nov. 12, 2024). Kingcade's contrary contention is unpersuasive; he does not raise a Sixth or Fourteenth Amendment claim based on the state court's exclusion of evidence. *See* Dkt. 28 at 4. Kingcade could not have introduced much of the evidence that he faults Short for omitting, so that cannot support a claim of ineffective assistance.

Furthermore, as the state court of appeals notes, Short did cross-examine F.F. about her role in the Divine homicide and argued to the jury that she knowingly participated in it but was never charged because she managed to gain sympathy from the investigators and prosecution by accusing Kingcade of sexual assault. *See* Dkt. 5-17 at 128; Dkt. 5-19 at 144–45, 153–55, 162.

Kingcade contends that the court erred in characterizing Short's attacks on F.F.'s credibility as "cumulative evidence." *See* Dkt. 16 at 35; *Kingcade*, 2020 WI App 1, ¶ 50. Kingcade explains that the Short's questioning and arguments were not cumulative because "evidence is only cumulative if it supports a fact established by existing evidence." *See* Dkt. 16 at 34. Kingcade also explains that Short's credibility attacks were "completely speculative" because, owing to his inadequate investigation, he lacked the factual basis necessary to support those attacks. *Id.* at 35.

13

This argument ignores that Short could not have presented much of the evidence that Kingcade faults him for omitting. Also, F.F.'s and Hale's testimony provided a basis for Short to argue that F.F. had a motive to falsely accuse Kingcade of sexual assault. Short vigorously made that argument to the jury, which the jury rejected in finding Kingcade guilty.

As the state circuit court found in denying Kingcade's postconviction motion, Kingcade's defense theory "made [little] sense." *See* Dkt. 10-4 at 2. F.F. didn't press charges against Kingcade for another 12 years. That lengthy delay dispels the idea that F.F. initially accused Kingcade of sexual assault to deflect blame for the homicide or to retaliate against Kingcade for providing information used in Tate's prosecution. The state court of appeals' conclusion that Kingcade could not show prejudice on claim 2 was at least reasonable.

Claim 2 lacks merit.

### 3.  Claim 3

Kingcade faults Short for failing to present evidence that S.W. repeatedly denied any sexual assault when initially interviewed by police in 1992, and to object to the prosecutor's false arguments that S.W. disclosed an assault at that time and then recanted. Detective Johnson testified that S.W. told Johnson in 1992 that Kingcade had sexually assaulted S.W. a year earlier, while S.W. was still in middle school. *Kingcade*, 2020 WI App 1, ¶ 55. Johnson also testified that police investigated the assault but that S.W. was uncooperative at that time. *Id.*

The state court of appeals rejected this claim, concluding that "Kingcade failed to show that, had [Short presented that evidence], the outcome of the trial would have been different." *Kingcade*, 2020 WI App 1, ¶ 55; *see also id.* ¶ 58 ("We agree with the circuit court's conclusion that, when viewed against the totality of evidence presented at trial, it cannot be said that the outcome of this trial would have been different."). Kingcade argues that in rejecting claim 3

the state courts misapplied *Strickland*'s test for prejudice, which requires only "a reasonable probability that . . . the result of the proceeding would have been different." 466 U.S. at 694; *see also* Dkt. 16 at 38. The court assumes for purposes of this opinion that the state courts unreasonably applied *Strickland* when rejecting claim 3 by misstating the test for prejudice. Accordingly, the court reviews the prejudice prong on claim 3 de novo. *Thomas v. Clements*, 789 F.3d 760, 768 (7th Cir. 2015).

Even under de novo review, Kingcade has not shown that Short's failure to present evidence of S.W.'s denials in 1992 prejudiced him. The trial court admitted S.W.'s statements to the police in 2015 that: (1) Kingcade had sexual intercourse with her in December 1991; and (2) she didn't disclose the sexual assault then because she was 13, it was flattering that an older man liked her, and she was worried about getting in trouble. Dkt. 5-17 at 182–86. By contrast, while S.W. did not explicitly deny on the stand that Kingcade sexually assaulted her, her testimony came close to an outright denial. *See, e.g.*, Dkt. 5-17 at 186 ("[E]verything that [Johnson] came to [her] home and said was incorrect."); *id.* at 182–83 (suggesting that Johnson "was telling [her]" that Kingcade sexually assaulted her). In finding Kingcade guilty, the jury necessarily believed S.W.'s prior statements, despite the inconsistency with her trial testimony. Even if Short had introduced S.W.'s affirmative denials from 1992 that Kingcade assaulted her in 1991, the jury almost assuredly would have disregarded those statements and believed S.W.'s accusatory statements to Johnson in 2015.

Additional evidence supported the jury's rejection of S.W.'s trial testimony. As the state court of appeals noted in denying claim 3, Dr. Salter testified about the reluctance of child sexual assault victims to report sexual assault and cooperate with law enforcement. *Kingcade*, 2020 WI App 1, ¶ 58. More specifically, Salter discussed factors that could explain a child's

delayed disclosure, including emotional immaturity, lack of maternal support, a child's bonding

with her abuser, and fear. *See* Dkt. 5-18 at 177, 180–82. Similarly, S.W. told Johnson that:

(1) she was 13 when the sexual assault occurred; (2) she found it flattering that an older man

liked her; (3) she was worried that she would get in trouble if she disclosed the sexual assault;

and (4) she had family issues and lived with her grandmother as a result. *See* Dkt. 5-17

at 184–86. Salter's testimony and S.W.'s statements to Johnson together supported a finding

that Kingcade abused S.W. in 1991 but that she didn't initially disclose the abuse because of

her immaturity, family issues, fear, and attachment to Kingcade.

Kingcade argues that Salter's testimony didn't support S.W.'s accusatory statements to

Johnson because Salter testified about delayed disclosures, not outright denials of sexual abuse.

But a reasonable jury could draw the connection: S.W. affirmatively denied in 1992 that

Kingcade sexually assaulted her, which clearly implies that she had yet to disclose the assault,

although she later did to Johnson. Kingcade hasn't shown that Salter's testimony lacked a

reasonable relationship to S.W.'s 2015 after-the-fact accusation of sexual assault.

S.W.'s in-court testimony also supported a finding that her 2015 statements to Johnson

were true. The trial court found that S.W. displayed selective memory on the stand, and the

trial transcript supports that finding. Similarly, Johnson testified that S.W.'s attitude changed

after she received a subpoena to testify in 2016. Dkt. 5-18 at 111–12. The evidence and

Johnson's in-court actions provided a basis for the jury to reject her in-court testimony in favor

of her 2015 statements.

There's yet more evidence. The trial court allowed joinder of the counts against F.F. and

S.W. because "evidence from one count would have been admissible as evidence of Kingcade's

method of operation, which was common to both allegations." *Kingcade*, 2020 WI App 1, ¶ 72

n.6. The trial court described Kingcade's alleged method of operation as "(a) using his position in the school district, (b) to groom girls, (c) who were adolescents, (d) lacking in parental oversight, (e) so that he could later have penis-to-vagina intercourse with them." *Id.* The state presented evidence of this method of operation for both F.F. and S.W. *See, e.g.*, Dkt. 5-17 at 182–86. And, as Kingcade seems to acknowledge, evidence that he used this method of operation on F.F. is also relevant to prove his guilt with respect to S.W. *See* Dkt. 16 at 44 ("[D]irect evidence of guilt on Count 2 [included] carryover effect from the Count 1 allegations."); *see also id.* at 9 (trial court's instruction in response to jury question "that the verdicts must be separate, but . . . evidence of one charge was admissible to the other"). The substantial evidence of Kingcade's method of operation also supported the jury's finding of guilt on count 2.

Kingcade hasn't shown a reasonable probability of a different result at trial had Short presented evidence of S.W.'s repeated denials in 1992 that he sexually assaulted her. Claim 3 lacks merit.

### 4. Claim 4

Claim 4 includes two related *Strickland* claims. Kingcade faults Maciolek for omitting claim 4 on direct appeal. In claim 4, Kingcade contended that Short provided ineffective assistance by  failing to object to and challenge irrelevant and improper statistical testimony by Dr. Salter about a study by researchers Nico Trocmé and Nicholas Bala. Salter testified that the study found that there was a two percent rate of false allegations in sexual abuse cases, and that the rate of false allegations by children was zero. Dkt. 5-18 at 191–92. During closing, the prosecutor argued that Salter testified that "there's an extremely low rate of false allegations, almost zero percent." Dkt. 5-19 at 118. Kingcade contends that Salter improperly vouched for

F.F.'s and S.W.'s credibility by "presenting statistics which created  a near mathematical certainty that the sexual assault allegations were true." Dkt. 16 at 41. Kingcade also says that Salter's testimony about the study was "highly misleading" because she misstated its findings. *Id.* at 42.

The state court of appeals rejected claim 4 and denied the petition, concluding that the "potential prejudice from [Salter's] testimony [about the study was] only moderate, at best." Dkt. 5-7 at 3. The court explained that, while Salter's testimony was focused on false reporting by children, there was no evidence presented at trial that the victims first disclosed the sexual assaults as children. *See id.* at 2–3.

The court's rejection of claim 4 was reasonable. The jury convicted Kingcade based on evidence that F.F. and S.W. first disclosed their sexual assaults as adults, so Salter's testimony about the Trocmé and Bala study had limited applicability. Kingcade observes that the state incorrectly argued to the jury that S.W. first disclosed her assault as a child. But the trial court instructed the jurors that: (1) they must base the verdict on only the law and the evidence, which did not include the attorneys' arguments; (2) the jurors were the judges of credibility. Dkt. 5-17 at 9, 12–13; Dkt. 5-19 at 97–98, 107–08; *see also* Dkt. 5-7 at 3. "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Also, Salter's testimony about the Trocmé and Bala study was a small part of her testimony, and she acknowledged that it was "obvious" that children had at some point made false allegations of sexual abuse. *See* Dkt. 5-18 at 192.

Claim 4 lacks merit. *See Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

18

5. **Claim 5**

Kingcade contends that the cumulative effect of the trial court's alleged errors prejudiced him. *See Hodkiewicz v. Buesgen*, 998 F.3d 321, 329 (7th Cir. 2021) ("[*Strickland*] prejudice may be based on the cumulative effect of multiple errors."). The state court of appeals denied this claim on direct appeal, concluding that Kingcade failed to show a "substantial likelihood of a different outcome, particularly given the significant evidence against him at trial." *Kingcade*, 2020 WI App 1, ¶ 62. In denying Kingcade's habeas petition alleging ineffective assistance of appeal counsel, the court also concluded that claim 4 failed to support his claim based on cumulative error. Dkt. 5-7 at 3.

The state court of appeals' rejection of claim 5 was reasonable. As the above analysis shows, the evidence of Kingcade's guilt overall was substantial, and Kingcade has shown at most only modest prejudice from each of Short's alleged errors.

In addition, the state presented evidence that Kingcade was aware of his guilt. Johnson testified that, on April 28, 2016, officers went to Kingcade's apartment and knocked and announced their presence. Dkt. 5-18 at 113, 115. No one answered. *Id.* at 113. A few minutes later, Kingcade's then-roommate, Kelli Burrell, arrived. *Id.* Johnson testified that Burrell told her that Kingcade had called Burrell and said that police officers were there "to get him." *Id.* at 119. According to Johnson, Burrell said that the balcony door was open even though it was always closed, and that Burrell was worried that Kingcade had jumped from the apartment's balcony to "get away" from the officers. *Id.* at 118. Kingcade waited for two days before turning himself in. *Id.* at 122. A week before the officers went to Kingcade's apartment, a woman told him that the police had questioned her about sexual assault allegations. *Id.* at 119–20.

19

The trial court admitted Burrell's statements to Johnson as substantive evidence, finding that she displayed selective memory on the stand. *Id.* at 147. The prosecutor argued that Kingcade's flight showed that he "knew what he was doing," and the trial court instructed the jury that it had to decide whether Kingcade showed consciousness of guilt and, if so, whether that fact showed actual guilt. Dkt. 5-19 at 104, 114–15. Coupled with the other evidence of Kingcade's guilt, the jury readily could have made that finding. *Cf. Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010) ("Those who do not take into account conditional probability . . . . [m]ay think that if a particular fact does not itself prove the ultimate proposition . . . , the fact may be tossed aside and the next fact may be evaluated as if the first did not exist.").

Kingcade contends that the evidence concerning the assault of S.W. was "incredibly weak," saying that it was limited to prior inconsistent statements that she denied making and the "carryover effect the jury gave to the [F.F.] allegations." *See* Dkt. 16 at 38. Kingcade notes that the jury asked the trial court if it could use the findings from one count "as a pattern of behavior applicable to the second charge," and later submitted a note stating that it could not reach a unanimous verdict on the count 2. *Id.* at 39. Kingcade's view of the evidence supporting count 2 is too narrow, because it was not merely the carryover effect of the evidence on count 1. *See supra* pp. 14–17.

Even if the jury conceivably could have rendered a more favorable verdict had Short performed as Kingcade wishes, the "likelihood of a different result must be substantial, not just conceivable." *Hodkiewicz*, 998 F.3d at 330 (citing *Harrington v. Richter*, 562 U.S. 86, 112 (2011)). Kingcade's attempted showing of cumulative effect does not raise a substantial possibility of a different result. Claim 5 lacks merit.

No evidentiary hearing is warranted because, as my analysis shows, "the record . . . precludes habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). I have resolved the issues raised in the petition "by reference to the state court record." *Id.*

I will direct the clerk of court to seal the trial transcript because it refers to the victims by name.

## CERTIFICATE OF APPEALABILITY

Because Kingcade seeks relief under § 2254, he may appeal this order only if he obtains a certificate of appealability. I may issue a certificate of appealability only if Kingcade makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, he "must demonstrate that reasonable jurists would find [my] assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 474 (2000). Kingcade hasn't made this showing, so I will deny a certificate of appealability. Kingcade may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.

## ORDER

IT IS ORDERED that:

1. Petitioner Shelton Kingcade's habeas petition, Dkt. 1, is DENIED.

2. A certificate of appealability is DENIED.

3. Dkt. 5-17, Dkt. 5-18, and Dkt. 5-19 are to be SEALED.

4. Wayne Olson is to be substituted as the respondent.

5.  The clerk of court is directed to enter judgment and close the case.

Entered August 21, 2025.

> BY THE COURT:
>
> /s/
>
> _____
> JAMES D. PETERSON
> District Judge